**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 23-12136

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

PLAMEN GEORGIEV VELINOV,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:21-cr-00342-VMC-SPF-1

_____

Before BRANCH, LUCK, and LAGOA, Circuit Judges.

LUCK, Circuit Judge:

After a jury trial, Plamen Velinov was convicted of conspiring to advertise and distribute visual depictions of minors engaging

in sexually explicit conduct and sentenced to 300 months' imprisonment. He appeals his convictions and sentence, raising five issues on appeal. As to his trial, Velinov argues that the district court: (1) violated his Sixth Amendment right to a complete defense by preventing him from questioning witnesses about whether the pictures and videos he advertised and distributed depicted legal "child erotica"; (2) erred by denying his motion for judgment of acquittal because the pictures and videos he advertised and distributed did not depict the "lascivious exhibition of the anus, genitals, or pubic area" of a minor; and (3) violated his Fifth Amendment right to due process by giving the jury an unconstitutionally vague definition of "lascivious exhibition." As to his sentence, Velinov contends that the district court (4) violated his Fifth Amendment right to due process by considering statistical evidence from a United States Sentencing Commission report without giving him a meaningful opportunity to refute it, and (5) imposed a substantively unreasonable sentence. After careful review, and with the benefit of oral argument, we affirm.

## FACTUAL BACKGROUND

Velinov played a key role in managing Newstar, a vertically-integrated business that produced, marketed, and distributed highly sexualized pictures and videos of children. Newstar sent photographers and videographers to Eastern European countries like Ukraine and Moldova to recruit children—mainly young girls eight to twelve years old—as "models." These girls often came

from single-parent homes with limited resources and Newstar usually paid parents less than $100 per day to use their girls for photoshoots. The girls were dressed in skimpy bathing suits, see-through lingerie, and tight underwear that visually exposed their genitals and pubic areas, and were posed in sexualized positions, some with their legs splayed open, others touching their underwear near the pubic area, and still others prone in the "doggy-style" position, with their legs open, back arched, rear end up, shoulders down, and genitals displayed to the camera.

Newstar sold these pictures through the "Newstar Model Collection," a network of websites it controlled and operated. The Newstar Model Collection involved about one hundred different websites, each dedicated to a different girl. Each website had a landing page with a large picture of the girl, usually displayed in a provocative pose. Users that wanted more had to pay. If they navigated past the landing page, they were prompted to subscribe for access to the full gallery—$49.99 for thirty days, $69.99 for sixty days, and $95.99 for ninety days—payable by credit card or cryptocurrency.

The Newstar Model Collection websites were connected to each other through advertising banners enticing the user to subscribe to other websites in the Newstar universe. One banner read: "[h]ow can we describe the dream that is [D.]? A dream that will haunt you with its beauty until you visit her again, so she can keep you under her spell. Join her today. Check out the free previews." And another beckoned: "[c]ome taste the [L.'s] photo pieces! Each

piece has a whole [] gallery of sweet photos for our members!  Enjoy, sugar free."

Each website also contained a "Buy My Videos Here!!!" link, which redirected the user to Clipmonster.net, another Newstar website where users could purchase individual videos of the girls from the Newstar Model Collection websites.  The Clipmonster videos were similar to the Newstar Model Collection pictures.  One video had a "pre-pubescent female child and a post-pubescent female" wearing "full white lingerie," intertwined together, with their legs open to the camera and their rear ends exposed.  Another had "a little boy and little girl in close proximity in various sexual poses," and yet another had "a pre-pubescent female child wearing a mesh outfit" with "her nipples . . . visible through the mesh" and "leggings" that "appear[ed] to be crotchless."

Revenues from the sale of these pictures and videos passed through Newstar's in-house payment platform, Cyber-pay.net, which processed credit card and cryptocurrency purchases for the subscriptions and content purchased through the Newstar Model Collection and Clipmonster.  The business was both prolific and lucrative.  From 2004 to 2019, Newstar produced more than 4.6 million pictures and videos, generating more than $9.4 million in revenue from tens of thousands of customers in 101 countries worldwide.  To launder the proceeds, Newstar opened bank accounts in the United States by misrepresenting the nature of Newstar's business and the accounts' intended use.

Velinov, based in Bulgaria, was involved in nearly every aspect of the business. From 2006 to 2019, Velinov worked closely with Newstar's founder, Kenneth Power, with whom he spoke "almost every day." Together with Power, Velinov played a key role in curating the websites' content. As Power told Velinov, the goal was to "maximize profit" by appealing to "all people[s'] fetish[es] . . . to catch everyone." And that's what Velinov did, directing Newstar's photographers and videographers on how to make "nuclear sexy" content. Pictures and videos with "all the clothes" were "not what the customer want[ed]." But a different video was "fine" because the girl at least "show[ed] some panties." As Velinov told Power, the videographers should "make the videos when [the girls] are in bathing suits at least."

Velinov and Power often discussed the relative attractiveness of the girls and how pretty they would be if they continued to use them as they got older. Velinov remarked that one girl was "nuclear sexy." But Power also talked to him about how girls from a particular town "must [be] inbr[ed]" because "[e]verybody looks the same." Power told Velinov that although "there are also a lot of pretty ones," he could tell which ones "will get fat," and Velinov agreed that "it is easy seeing as they are fat even now." At one point, Velinov lamented that he wished "we could get at least [C.] back," referring to a girl whose pictures and videos were particularly popular with Newstar's customers, but Power informed Velinov that this was not possible since "she is a prostitute now plus gets drunk every night."

When selecting content for the websites, Velinov picked the most sexually provocative pictures as previews to draw in more customers because, as he acknowledged, "only risky advertisement can get us more sales." He and Power selected which photos and videos would make the cut for the websites, "go[ing] through sales" data to ensure the websites presented girls in ways that would appeal to the most customers. Velinov monitored the sales trends of the girls, observing when a girl's popularity peaked and declined and comparing the girl's popularity to that of other girls. He noted that one girl's webpage "made [$5,000] without updates for a year," but he also knew that there was no point to "paying $4,000 a month for updates on sites that make no profit." Another time, he released "one video left unpublished of a previous[ly] very popular [girl]," and since that video was "long enough," he "split[] it in two parts . . . for a price of $29.95 for each part," to maximize revenue.

Velinov was also responsible for "mak[ing] sure that the websites were running smoothly and right." He worked on programming the websites and communicated directly with customers to resolve technical issues and to answer questions about new releases. In doing so, he knew the need for discretion. He created multiple servers to host the websites "hidden behind proxies so nobody kn[e]w[] about [them]," and made sure payments to photographers and videographers were "hard to trace." As he confided to Power, Velinov knew the business was dangerous and had "fears" about the risk to his "wife and family and freedom" because of his work.

## PROCEDURAL HISTORY

Velinov's fears were well justified.  In 2019, Newstar was shut down in an international law enforcement exercise spanning the United States, the Netherlands, Bulgaria, and other countries.  Velinov was indicted for conspiring to advertise visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. section 2251(d), (e), and conspiring to distribute visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. section 2252(a)(2), (b)(1).  Velinov pleaded not guilty and proceeded to a jury trial.

### A.  Trial

We'll focus on the parts of the trial relevant to Velinov's appeal:  (1) the cross-examination of the law enforcement witnesses; (2) the denial of his motion for judgment of acquittal; and (3) the jury instructions.

### 1.  Cross-Examination

The government presented testimony from four federal agents:  Alison Boos, Gibran Ali, Joshua Storey, and Tavey Garcia.  Velinov sought to cross-examine each of them about the lawfulness of "child erotica" and the difference between "sexually suggestive" and "sexually explicit conduct."

First, Velinov cross-examined Agent Boos about internal status reports that she sent to her bosses at the Department of Justice.  The reports started with the same preamble:  Velinov and his co-

conspirators were "running and facilitating commercial child erotica websites" and the websites depicted "clothed minors, some clearly pre-pubescent, and many [we]re posed in a sexually suggestive manner."

Velinov had Agent Boos read the preamble, and then asked, "[i]t doesn't say sexually explicit manner, sexually explicit conduct?" The government objected that the question called for a legal conclusion, and the district court asked Velinov to rephrase the question. Velinov then asked, "commercial child erotica websites, those are lawful, right?" The government made the same objection, which the district court sustained.

Next, Velinov cross-examined Agent Ali. As he did with Agent Boos, Velinov asked Agent Ali, "something that's sexually suggestive is, you would agree, different from something that is sexually explicit?" The government objected, and the district court sustained the objection because the question called for a legal conclusion.

Then, Velinov cross-examined Agent Storey. Velinov asked, "is it fair to say that there is a lot of material in . . . the public airwaves that would be classified as child erotica?" The district court sustained the government's objection because the question called for a legal conclusion.

Finally, Velinov cross-examined Agent Garcia, the lead investigator in the case. Velinov asked again, "[w]ould you agree that sexually suggestive is something different from sexually explicit;

would you agree with that?" The district court again sustained the government's objection.

### 2. Motion for Judgment of Acquittal

At the close of the government's case, Velinov moved for a judgment of acquittal, arguing that the government did not establish that the pictures and videos he helped advertise and distribute depicted "sexually explicit conduct" because the minors were not nude. Thus, he argued, the pictures and videos were "commercial child erotica, which under the case law is on the legal side of the line."

The government responded that the statutory definition of "sexually explicit conduct" includes "lascivious exhibition of the genitals and pubic area," which does not require that the depiction be of a nude minor. The district court denied the motion because the evidence was "sufficient there to move forward to the next stage." Velinov rested his case without presenting any evidence.

### 3. Jury Instructions

The district court instructed the jury that the statutory definition of the term "sexually explicit conduct" meant "actual or simulated: (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person." "Lascivious exhibition," in turn, was

defined as "indecent exposure of the anus, genitals, or pubic area, usually to incite lust."

"Visual depictions," the instructions explained, "do not need to be nude depictions to qualify as 'lascivious exhibition of the anus, genitals, or pubic area of any person.'" And "[n]ot every exposure is a lascivious exhibition." "Sexually explicit conduct," the district court continued, "requires more than . . . [m]erely sexually suggestive images of children," which "are sometimes referred to as 'child erotica.'"

The instructions acknowledged that the line between "forbidden 'lascivious exhibition of the anus, genitals, or pubic area' and . . . an innocuous photograph of a naked child (e.g., a family photograph of a child taking a bath, or an artistic masterpiece portraying a naked child model) is not concrete." So, borrowing from our pattern jury instructions, the district court gave the jury factors to consider in "decid[ing] whether a visual depiction is a lascivious exhibition." The jury was told to "consider the context and setting in which the anus, genital[s], or pubic area is being displayed," and

> [1] the overall content of the material; [2] whether the focal point of the visual depiction is on the minor's anus, genitalia, or pubic area; [3] whether the setting of the depiction appears to be sexually inviting or suggestive—for example, in a location or in a pose associated with sexual activity; [4] whether the minor appears to be displayed in an unnatural pose or in inappropriate attire; [5] whether the minor is partially clothed or nude; [6] whether the depiction appears to

convey sexual coyness or an apparent willingness to engage in sexual activity; and [7] whether the depiction appears to have been designed to elicit a sexual response in the viewer.

Velinov objected that the inclusion of these considerations "render[ed] the statute unconstitutionally vague." The district court overruled the objection, noting that the language was taken from our pattern instructions.

## B. *Sentencing*

The jury found Velinov guilty of both counts. After the verdict, the United States Probation Office prepared a presentencing investigation report, which calculated a guideline range of 600 months' imprisonment.

Velinov argued for a downward variance to 180 months (the statutory minimum) for two reasons. First, his case was "outside the heartland" of child pornography cases because the pictures and videos had no nudity or sexual activity and he did not abuse any child, so his conduct was less harmful compared to other defendants. In support, Velinov cited a United States Sentencing Commission report showing that defendants sentenced under the same guideline received an average of 103 months' imprisonment except for defendants with "sexually dangerous behavior histories," who received an average of 134 months' imprisonment. Second, Velinov argued that he should get a downward variance because some of his coconspirators received shorter sentences.

In considering Velinov's request for a variance, the district court explained that, "[a]ccording to [the Commission]'s judiciary sentencing information report," a defendant sentenced under the same guideline with the same offense level and criminal history as Velinov had an average term of 323 months' imprisonment. Velinov objected to the court's consideration of the Commission's report, arguing that he did not have a "chance to research these statistics" and that "based on [his] research, [he] could promise" that the "awful horrible abuse of children . . . [was] included in this statistic, assuming it's accurate." The district court confirmed with the probation officer that the report did not include cases where the defendant abused children. Still, the court explained, it would "make [its] own decision" regardless of what the report said. As to Velinov's coconspirators, the district court noted that they had pleaded guilty and cooperated with the government, so "you're not really comparing apples with apples."

Nevertheless, the district court granted Velinov's request to vary downward, and sentenced him to 300 months' imprisonment. The variance was called for, the district court said, because the guidelines were a "starting point." This was Velinov's first arrest and conviction, and the case did "not fall into the heartland of the other cases [involving] the use of children in a sexual nature and with respect to other deviant behavior." But, the court concluded, it would not vary downward as much as Velinov wanted because of the harm he had caused to the child victims, "the money that had been made," and his substantial involvement in the Newstar enterprise.

Velinov appeals his convictions and sentence.

## DISCUSSION

We'll begin with the three errors Velinov contends the district court made at his trial. Then, we'll address his two sentencing issues.

### A. Trial Issues

First, Velinov argues that the district court deprived him of the right to present a complete defense by limiting his cross-examination of the law enforcement witnesses about the line between legal child erotica and illegal sexually explicit conduct. Second, Velinov asserts that the district court erred in denying his motion for judgment of acquittal because the pictures and videos he advertised and distributed did not involve lascivious exhibitions of a minor's anus, genitals, or pubic area. And third, Velinov maintains that the district court's instruction to the jury defining lascivious exhibition was unconstitutionally vague. We'll take these arguments in turn.

### 1. Cross-Examination

Starting with the cross-examination issue, the Fifth and Sixth Amendments to the Constitution "guarantee[] criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citation modified). We apply a two-step framework to evaluate whether a court violated this guarantee: (1) first, we examine whether the "right was actually vio-

lated," and (2) if so, we next look at "whether the error was 'harmless beyond a reasonable doubt.'" *United States v. Hurn*, 368 F.3d 1359, 1362–63 (11th Cir. 2004) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).[1]

At the first step, a district court does not violate the defendant's right to a complete defense if it "permits [the] defendant to present the essence of his desired argument to the jury . . . ." *United States v. Harris*, 916 F.3d 948, 959 (11th Cir. 2019) (citing *United States v. Buckley*, 586 F.2d 498, 503 (5th Cir. 1978)). The "exclusion of some portions of [a witness's] testimony" does not violate the defendant's complete-defense right when the district court "did not prevent [the defendant] from introducing the key elements of his defense and placing his story before the jury." *United States v. Frazier*, 387 F.3d 1244, 1273 (11th Cir. 2004) (en banc); *see also United States v. Akwuba*, 7 F.4th 1299, 1312 (11th Cir. 2021) (finding that erroneous jury instruction did not violate the defendant's right to a complete defense when the defendant "was still able to put forth her . . . defense in her closing statement and through multiple witnesses" and therefore "was not prevented from presenting her theory of defense to the jury").

That's what happened here. Velinov was not prevented from presenting "[his] desired argument to the jury" that legal child erotica was distinct from illegal sexually explicit conduct through

---

[1] We review de novo whether the exclusion of evidence violated a defendant's constitutional right to present a complete defense. *See United States v. Starr*, 159 F.4th 901, 907 (11th Cir. 2025).

23-12136                Opinion of the Court                15

witness testimony, the jury instructions, and his closing argument. *See Harris*, 916 F.3d at 959.  Specifically, Velinov had Agent Boos read her internal status reports where she characterized the Newstar websites as "child erotica websites" that sold pictures of "clothed minors, some clearly pre-pubescent," "posed in a sexually suggestive manner."  And Velinov had the district court instruct the jury that "[s]exually explicit conduct requires more than pictures of children that are sexually suggestive" and that "[m]erely sexually suggestive images of children are sometimes referred to as 'child erotica.'"

Using this instruction and Agent Boos's reports, Velinov argued in closing that child erotica was "legal pictures of children. Creepy, but legal."  In Velinov's telling, applying "the judge's instructions" to Agent Boos's references "to Newstar as commercial child erotica websites" proved that Newstar's pictures and videos were "legal material."  Velinov urged the jury to "[l]ook at the judge's instructions for what it takes to show sexually explicit conduct" and "let your own eyes evaluate the evidence."

Velinov, in other words, had the key elements of his defense to place his story before the jury.  *See Frazier*, 387 F.3d at 1273.  He had evidence that the pictures and videos were only sexually suggestive, and he had a jury instruction that more was required for a conviction.  Because he was permitted "to present the essence of his desired argument to the jury," his right to present a complete defense was not violated.  *Harris*, 916 F.3d at 959.

### 2. Motion for Judgment of Acquittal

Next, Velinov argues that the district court erred in denying his motion for judgment of acquittal.[2] The elements of Velinov's two convictions—conspiring to advertise and conspiring to distribute visual depictions of minors engaged in sexually explicit conduct—are largely the same. Federal law prohibits conspiring to advertise and distribute in interstate or foreign commerce any "visual depiction" that "involves the use of a minor engaging in sexually explicit conduct." *See* 18 U.S.C. §§ 2251(d)–(e), 2252 (a)(2), (b)(1).

Velinov doesn't dispute that he was part of a conspiracy. And he does not dispute that he and the other coconspirators he worked with advertised and distributed visual depictions of minors. The only element Velinov disputes, here and below, is that the depictions of minors he advertised and distributed involved minors engaged in "sexually explicit conduct."

"[S]exually explicit conduct" is "actual or simulated . . . (i) sexual intercourse . . . ; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the anus, genitals, or pubic area of any person." *Id.* § 2256(2)(A). Here, the

---

[2] We review de novo a sufficiency-of-the-evidence challenge raised in a motion for judgment of acquittal, viewing the evidence in the light most favorable to the verdict. *United States v. Jimenez*, 972 F.3d 1183, 1190 (11th Cir. 2020). "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Watts*, 896 F.3d 1245, 1251 (11th Cir. 2018) (citation modified).

government charged, and the jury was instructed on, the last kind of sexually explicit conduct—that the Newstar pictures and videos involved the "lascivious exhibition[s]" of a minor's "anus, genitals, or pubic area." *See id.* § 2256(2)(A)(v).

Velinov contends that the "lascivious exhibition" of a minor's "anus, genitals, or pubic area" requires either a nude depiction or a sex act. The evidence was insufficient to convict him, he argues, because the Newstar pictures and videos depicted neither.

That's wrong because the pictures and videos Velinov advertised and distributed did depict nude minors through transparent lingerie and tight underwear that visually exposed girls' genitals and pubic areas. One picture he advertised and distributed, for example, showed a girl in sheer baby blue panties with pink hearts, lying on her back with her legs spread open and her labia visible through the see-through fabric. Another picture depicted a girl lying on her back with her legs spread apart and knees bent with the outline of her genitals protruding through sheer purple panties. A third picture was of a girl in white panties pulled up so tightly over her pubic area that the outline of her labia was visible though the underwear. And a fourth picture showed a girl posing in blue bikini bottoms so small and narrow that the sides of her pubic area were left completely bare and visible up to the labia. There were others the jury saw.

Velinov is also wrong that a lascivious exhibition of the anus, genitals, or pubic area requires a sex act. It does not. As we ex-

plained in *United States v. Holmes*, 814 F.3d 1246 (11th Cir. 2016), "depictions of otherwise innocent conduct may in fact constitute a 'lascivious exhibition of the genitals or pubic area' of a minor based on the actions of the individual creating the depiction." *Id.* at 1251–52; *see also United States v. Johnson*, 639 F.3d 433, 440 (8th Cir. 2011) ("[E]ven images of children acting innocently can be considered lascivious if they are intended to be sexual.").

That's because a depiction is a "lascivious exhibition" of a minor's anus, genitals, or pubic area when it "potentially excites sexual desires or is salacious." *United States v. Grzybowicz*, 747 F.3d 1296, 1306 (11th Cir. 2014) (citation modified). This focuses on the "actions of the individual creating the depiction," and not on the actions of the victim. *Holmes*, 814 F.3d at 1252. We focus on the defendant's actions and not the child's because "[l]asciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or like-minded pedophiles." *Id.* at 1252 (quoting *United States v. Wiegand*, 812 F.2d 1239, 1244 (9th Cir. 1987)).

To do this, we examine the "actual depictions themselves" to see whether they "featured the child . . . as a sexual object . . . presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur." *Id.* at 1251–52 (quoting *Wiegand*, 812 F.2d at 1244). For example, in *Holmes*, the defendant installed a hidden camera to record his stepdaughter changing. *Id.* at 1251–53. The defendant argued that the videos were not lascivious exhibitions of the anus, genitals, or pubic area because the "original depiction

[was] one of an innocent child acting innocently." *Id.* at 1252. But we rejected that argument, finding that the "placement of the cameras," the "focus on videoing and capturing pictures of [the victim's] pubic area," the "angle of the camera set up," and the defendant's "editing of the videos at issue" to capture his minor stepdaughter's pubic area were sufficient "to create a lascivious exhibition of the genitals or pubic area." *Id.* at 1252. Similarly, in *Grzybowicz*, we looked at what the photographer did to stage the picture, the "focal point" of the pictures on the minor's genitals, and the fact that there was no "non-sexual purpose" to the pictures to determine that they were "blatantly lascivious." *See* 747 F.3d at 1306.

Applying these same considerations here, there was sufficient evidence that many of the Newstar pictures and videos were "lascivious exhibition[s] of the anus, genitals, or pubic area" of minors. *See* 18 U.S.C. § 2256(2)(A)(v). The pictures and videos exhibited girls' genitals or pubic areas in "pose[s] associated with sexual activity": laying on their back with their legs "splayed open"; on their knees with their shoulders down, back arched, and rear end up, with genitals towards the camera (colloquially known as "doggy-style"); and lying on their back with legs "up in the air and stretched" while "touching [their] underwear near their genital area." As in *Holmes*, the Newstar pictures and videos were focused on the genitals and pubic area, the camera was angled to highlight either the pubic area (the camera set facing forward) or genitals (the camera set from below, pointing up), and the videos were edited to feature the most salacious parts. *See* 814 F.3d at 1252.

Because these depictions "featured the" genitals or pubic area "as a sexual object . . . presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur," *id.* at 1252 (quoting *Wiegand*, 812 F.2d at 1244), the evidence was sufficient for a jury to find that they contained "lascivious exhibition[s]" of the "anus, genitals, or pubic area" of minors.  Thus, they were "visual depiction[s]" of "minor[s] engaging in sexually explicit conduct." 18 U.S.C. §§ 2252(a)(2), (b)(1), 2256(2)(A).

### 3.  Jury Instructions

As the last trial issue, Velinov challenges the district court's instruction to the jury defining lascivious exhibition.  He concedes that there's nothing wrong with the statutory definition, which the district court gave to the jury.  Instead, Velinov argues that giving the jury additional considerations[3] as a way to sort out a lascivious

---

[3] The district court instructed the jury that, "[t]o decide whether a visual depiction is a lascivious exhibition," it "may consider," (1) "the overall content of the material"; (2) "whether the focal point of the visual depiction is on the minor's anus, genitalia, or pubic area"; (3) "whether the setting of the depiction appears to be sexually inviting or suggestive—for example, in a location or in a pose associated with sexual activity"; (4) "whether the minor appears to be displayed in an unnatural pose or in inappropriate attire"; (5) "whether the minor is partially clothed or nude"; (6) "whether the depiction appears to convey sexual coyness or an apparent willingness to engage in sexual activity"; and (7) "whether the depiction appears to have been designed to elicit a sexual response in the viewer."

23-12136                Opinion of the Court                    21

exhibition of the anus, genitals, or pubic area from a depiction that is not lascivious rendered the definition unconstitutionally vague.[4]

We don't see it because the additional considerations the district court gave the jury are essentially the same as the usual factors we look at to determine whether a depiction is a "lascivious exhibition." In *Holmes*, for example, we used many of the same factors to determine whether depictions of the defendant's stepdaughter changing in the bathroom were lascivious exhibitions: the setting; the focus; the angle; the editing; how the minor was dressed; whether the depiction was one that "potentially excite[d] sexual desires or [was] salacious"; and whether the photo appeared to be designed "to arouse or satisfy the sexual cravings of a voyeur." 814 F.3d at 1251–53. Similarly, in *Grzybowicz*—where the defendant "reached under a little girl's dress, pulled aside her diaper, and took four pictures of her vagina"—we reviewed the depictions to see if they were lascivious by looking at whether the minor was nude or clothed, the focal point, whether the minor was in an unnatural pose, and whether there was any "non-sexual purpose" to the depictions. *See* 747 F.3d at 1306. In other words, the district court instructed the jury to review roughly the same considerations we already use in applying the legal definition of lascivious exhibition to depictions of a child's anus, genitals, or pubic area.

---

[4] "We review de novo the legal correctness of jury instructions . . . ." *United States v. Alexander*, 170 F.4th 1303, 1314 (11th Cir. 2026) (citing *United States v. Prather*, 205 F.3d 1265, 1270 (11th Cir. 2000)).

Pushing back, Velinov insists that the additional considerations in the district court's instructions made the statutory definition of "lascivious exhibition" vague because "there is little (lawful) child erotica which could not 'pass' one or more of the six factor[s]."  For instance, relying on *United States v. Hill*, 322 F. Supp. 2d 1081 (C.D. Cal. 2004), he asserts that the second consideration, which asked whether the focal point of the picture is the child's genitals or pubic area, was unhelpful in deciding whether a depiction is lascivious because "[a] close-up picture of female genitalia in a medical textbook will surely be less lascivious than a photograph showing the entire female body with the pubic area only partially visible." *Id.* at 1085.

But this misses the point.  The district court did not instruct the jury that any one of the additional considerations was dispositive.  Instead, it told the jury that a "[l]ascivious exhibition" is an "indecent exposure of the anus, genitals or pubic area, usually to incite lust" and that "whether a visual depiction is a lascivious exhibition" depends on "the context and setting in which the anus, genitalia or pubic area is being displayed."  It told the jury that it could use the additional considerations to evaluate the context and setting of the depiction.  But the district court did not suggest that they were exclusive or that any one factor was dispositive.

In fact, Velinov's example—a close-up picture of female genitalia in a medical textbook—shows how the district court's additional considerations clarify rather than obscure.  Looking to the full "context and setting in which the genitalia or pubic area is being

displayed," the jury would see no indication in the medical text-book: that "the setting of the depiction" was "sexually inviting or suggestive—for example, in a location or in a pose associated with sexual activity"; that "the minor appear[ed] to be displayed in an unnatural pose or in inappropriate attire"; that "the depiction appear[ed] to convey sexual coyness or an apparent willingness to engage in sexual activity"; or that "the depiction appear[ed] to have been designed to elicit a sexual response in the viewer." Nor would the "overall content" of the medical textbook suggest an "indecent exposure of the [anus,] genitals[,] or pubic area . . . to incite lust."

If anything, the additional considerations the district court gave to the jury clarified the line between a lascivious depiction of the anus, genitals, or pubic area and one that is not. Perhaps that's why most of our sister circuits use the same "general principles as guides for analysis" in determining whether a depiction is a lascivious exhibition. *United States v. Boam*, 69 F.4th 601, 609 (9th Cir. 2023) (quoting *United States v. Hill*, 459 F.3d 966, 972 (9th Cir. 2006)); *see also United States v. Deritis*, 137 F.4th 209, 219–20 (4th Cir.), *cert. denied*, 146 S. Ct. 270 (2025); *United States v. Heinrich*, 57 F.4th 154, 161 (3d Cir. 2023); *United States v. Petroske*, 928 F.3d 767, 773 (8th Cir. 2019); *United States v. Isabella*, 918 F.3d 816, 831 (10th Cir. 2019); *United States v. Spoor*, 904 F.3d 141, 148–49 (2d Cir. 2018); *United States v. McCall*, 833 F.3d 560, 563 (5th Cir. 2016); *United States v. Hodge*, 805 F.3d 675, 680 (6th Cir. 2015). *But see United States v. Hillie*, 39 F.4th 674, 689–90 (D.C. Cir. 2022) (explaining that some of the these additional considerations may "shed light" on whether a depiction is a lascivious exhibition, but rejecting "the

practice of instructing the jury on [them] as a matter of course, or in a manner that suggests those factors are sufficient to determine whether given conduct, depicted visually," is a lascivious exhibition).  Accordingly, we conclude that the jury instruction on these additional considerations did not render the statutory definition of "lascivious exhibition" unconstitutionally vague.[5]

## B.  Sentencing Issues

Switching gears, Velinov raises two issues with his sentence. First, he argues that the district court violated his right to due process by relying on the Commission report in rejecting his variance argument without giving him an opportunity to refute the report. And second, he challenges his sentence as substantively unreasonable.

## 1.  Reliance on the Commission's Report

A district court enjoys "wide latitude in the kinds of information it may consider in the sentencing decision."  *See United*

---

[5] Velinov focused primarily on the jury instructions and how they allegedly rendered the statutory definition of "lascivious exhibition" unconstitutionally vague.  To the extent that Velinov also argues that 18 U.S.C. § 2256 is unconstitutionally void for vagueness as applied to him because it fails to define with sufficient definiteness what conduct is prohibited and encourages arbitrary enforcement, he failed to raise such an argument below.  And he cannot show plain error because there is no precedent from the Supreme Court or this Court directly resolving the issue.  *See United States v. Penn*, 63 F.4th 1305, 1318 (11th Cir. 2023) ("There can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving the issue." (alterations adopted) (quotation omitted)).

*States v. Hall*, 965 F.3d 1281, 1294 (11th Cir. 2020) (quoting *United States v. Giltner*, 889 F.2d 1004, 1007 (11th Cir. 1989)). "A defendant is not denied due process of law when a judge considers out-of-court information in determining [his] sentence so long as the defendant is afforded an opportunity to refute it, and it is reliable." *United States v. Reme*, 738 F.2d 1156, 1167 (11th Cir. 1984) (citation modified). When a defendant claims a due process error because the district court considered out-of-court information, he must show that (1) "the challenged evidence is materially false or unreliable," and (2) "it actually served as the basis for the sentence." *United States v. Ghertler*, 605 F.3d 1256, 1269 (11th Cir. 2010).[6]

Velinov's argument that the district court violated his due process rights by considering the Commission report fails because he had an opportunity to refute the report, there's no reason to believe the report was unreliable, and the district court did not rely on the report in imposing the sentence. First, the district court afforded Velinov an opportunity to refute the report. At the sentencing hearing, the probation officer, based on the same Commission report Velinov cited to argue for a downward variance, told the district court that the average imprisonment term for offenders convicted under the guidelines with the same offense level and criminal history as Velinov was 323 months. Velinov responded by ob-

---

[6] We review de novo whether a district court's consideration of out-of-court information during the sentencing hearing violated the defendant's right to due process of law. *See Ghertler*, 605 F.3d at 1268.

jecting that this average likely included offenses involving the "awful horrible abuse of children." The district court considered the objection, and asked the probation officer whether the average included cases where criminal defendants had sex with children or allowed others to have sex with children. The officer replied that it did not and Velinov did not object further. So Velinov was given, and took, the opportunity to refute the report.

Second, there's no due process violation because Velinov doesn't argue the average sentence derived from the report was materially false or unreliable. *See Hall*, 965 F.3d at 1294 (finding no due process right violation when defendant did not meet his burden of showing challenged evidence was either materially false or unreliable); *Ghertler*, 605 F.3d at 1269 (same). He'd be hard-pressed to do so since the average sentence came from the same Commission report Velinov used to argue for a downward departure.

Third, there is no due process violation because the district court did not base Velinov's sentence on the Commission report. *See Ghertler*, 605 F.3d at 1269. When discussing the report, the district court explained that even though it "like[s] to see what other people have received, . . . statistics aren't the be-all-end-all" and that it would "make [its] own decision." The district court then went on to make its own decision by examining the case-specific reasons why a 300-month sentence was appropriate for Velinov, independent of the report.

23-12136                Opinion of the Court                27

## 2. Substantive Reasonableness

Velinov also argues that his below-guideline sentence was substantively unreasonable.[7]  It was not.

A sentence must be "sufficient, but not greater than necessary" to "reflect the seriousness of the offense," "promote respect for the law," "provide just punishment," "afford adequate deterrence," and "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a).  "The task is a holistic endeavor that requires the district court to consider a variety of factors," including "the nature and circumstances of the offense," "the defendant's history and characteristics," "the kinds of sentences available," the applicable guideline range, the Commission's policy statements, "the need to provide restitution to any victims," and "the need to avoid unwarranted sentencing disparities."  *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015) (citing 18 U.S.C. § 3553(a)).  The defendant bears "the burden of establishing that the sentence is unreasonable in light of the record and the [section] 3553(a) factors."  *United States v. Williams*, 526 F.3d 1312, 1322 (11th Cir. 2008).  We "ordinarily expect a sentence within the guideline[] range to be reasonable."  *United States v. Kirby*, 938 F.3d 1254, 1259 (11th Cir. 2019) (citation modified).

Velinov has not met his burden to show that his sentence was substantively unreasonable.  "Child sex crimes are among the

---

[7] We review for abuse of discretion the substantive reasonableness of a sentence.  *United States v. Oudomsine*, 57 F.4th 1262, 1266 (11th Cir. 2023).

28                    Opinion of the Court                23-12136

most egregious and despicable of societal and criminal offenses," inflicting a "compounding harm" on victims because they "incite or encourage others to sexually abuse children." *United States v. Irey*, 612 F.3d 1160, 1206, 1208 (11th Cir. 2010) (en banc) (citations omitted).  The district court properly considered the gravity of the offense and Velinov's own conduct.  It explained that although a downward variance was appropriate because Velinov's crimes did "not fall into the heartland of . . . [cases involving] the use of children in a sexual nature and . . . other deviant behavior," it could not "overlook what occurred here."

What occurred here was that Velinov played a major role in Newstar, an international child exploitation enterprise that harmed at least one hundred children and made over $9.4 million doing so. He provided advice to his coconspirators and assisted with the functioning and maintenance of the websites, the production and selection of pictures and videos, the creation of advertising banners, and the pricing, personally receiving over $400,000 for his role.  He knew girls were being harmed but continued to profit off their suffering for more than a decade.  In light of these considerations, Velinov's 300-month sentence—which was half the guideline range and well below the statutory maximum—was not unreasonable. *See United States v. Hayden*, 119 F.4th 832, 837 (11th Cir. 2024) ("A sentence within the guideline range and below the statutory maximum is ordinarily expected to be reasonable.").

Velinov nevertheless contends that his sentence was unreasonable compared to the lower sentences of his coconspirators.  He

argues that Tatiana Power—Kenneth Power's wife—was more culpable than him and only received 151 months' imprisonment. And he points to two other coconspirators, Patrice Wilowski-Mevorah and Mary Lou Bjorkman, who were involved in laundering Newstar's proceeds and received sixty-three months' and eighteen months' imprisonment respectively. Finally, he asserts that Pavel Rohel, a photographer convicted in the Czech Republic for sexually abusing girls used by Newstar, was significantly more culpable than he was and was sentenced to only fifty-four months' imprisonment.

The problem for Velinov is that these examples do not show unwarranted sentencing disparities because none of them were similarly situated to him. Section 3553(a) is concerned with sentencing disparities between defendants "found guilty of similar conduct" on "similar records." 18 U.S.C. § 3553(a)(6). Tatiana Power, Wilowski-Mevorah, and Bjorkman pleaded guilty to money laundering, so they were not "found guilty of similar conduct" as Velinov, who was convicted of conspiring to advertise and distribute visual depictions of minors engaging in sexually explicit conduct. *Id.* Tatiana Power and Wilowski-Mevorah also cooperated with the government and testified against Velinov. Defendants who cooperate and plead guilty are not similarly situated to those who do not cooperate and go to trial. *See United States v. Azmat*, 805 F.3d 1018, 1048 (11th Cir. 2015) ("[T]here is no unwarranted disparity when a cooperating defendant pleads guilty and receives a lesser sentence than a defendant who proceeds to trial." (quoting *United States v. Langston*, 590 F.3d 1226, 1237 (11th Cir.

2009)).  As for Rohel, foreign sentences are not relevant comparators because "[s]ection 3553(a)(6) is concerned with unwarranted disparities in sentences among federal defendants," not foreign ones.  *See United States v. Docampo*, 573 F.3d 1091, 1102 (11th Cir. 2009).  In short, none of these coconspirators were similarly situated to Velinov.  And their sentences do not call into question the reasonableness of Velinov's below-guideline sentence.

**AFFIRMED.**